JOHNSON v. ROTHSCHILDS.

Opinion delivered February 6, 1897.

PARTNERSHIP—WHEN EXISTS.—Whether a partnership exists in any particular case depends upon the intention of the parties, and is to be determined from the facts and circumstances in proof.

SAME—PARTICIPATION IN PROFITS.—Participation in the profits of a business is evidence of a partnership, and may be conclusive unless there are circumstances disproving the existence of that relation.

SAME—CASE STATED.—Where a father gave the profits of his business to his sons, upon an agreement that, in consideration of his leaving his original capital in the business, he should receive a share of its profits, without agreement that his capital should be repaid in any event, a finding of the chancellor that he was a partner with his sons will not be disturbed.

Appeal from Hot Springs Chancery Court.

CHARLES P. ROBERTS, Special Chancellor.

STATEMENT BY THE COURT.

On the 2d day of January, 1893, the firm of B. & H. Berger, merchants at Malvern, Arkansas, made an

assignment for the benefit of their creditors, preferring in said assignment, amongst others, several of their relatives, to the amount of $27,115.

Among the claims preferred was one in favor of their father, Leopold Berger, for $12,781.31. This amount consisted of $7,600, which Leopold Berger loaned to Ben Berger, which the firm is said to have assumed, and the sum of $5,181.31, being the amount said to be due from B. & H. Berger to Leopold Berger, as shown on the books of the firm, which originally was $4,000 said to have been loaned by Leopold Berger to B. & H. Berger at the time he claims to have retired from the firm in 1879.

The business in which they were engaged was begun by Leopold Berger in 1876 or 1877, on a capital of $4,000, which continued in his name until Henry Berger became of age in 1879, when the name of the firm was changed to that of B. & H. Berger. At this time it appears that Leopold Berger gave his sons, Ben and Henry Berger, the accumulated profits of the business, and left in it his original capital of $4,000, and continued to buy goods for the firm, with apparently unlimited authority to do so, with the understanding and agreement that he was to receive a per cent. of the profits of the business.

It appears that, less credits for amounts drawn out by Leopold Berger previously, his interest, with profits added, amounted on September 30, 1888 to $8,141, which, reduced by the credits, left the said sum of $5,181.31 due on the 20th of September, 1892. It appears that in 1888 Leopold Berger became an invalid, and unable to participate actively in buying for the firm.

For the sum of $5,181.31, the firm of B. & H. Berger, on the 20th of September, 1892, gave to Leopold Berger a note. This was three months and about a third before their assignment on the 2d of January, 1893.

It does not appear that when Leopold Berger is said to have withdrawn from the firm in 1879, and left his capital stock in the business, except the amount he gave to his sons, there was any promise, agreement or understanding exacted or had, between B. & H. Berger and Leopold Berger, that the sum left was to be repaid at all events, or at any time; but it appears that it was left on the security of the business, and not on the personal responsibility of B. & H. Berger.

On the 21st of February, 1892, the main store house and stock of goods of the firm was consumed by fire, and the firm lost heavily, though it received $32,000 on policies of insurance, and, shortly before this note was given to Leopold Berger, as above stated,—in August or September, 1892,—they had bought a large stock of goods of Ben Berger, upon which they sustained loss, and had assumed some $17,000 of Ben Berger's indebtedness, including a note to Leopold Berger,—other than the note above mentioned,—for $7,600.

After the fire they had erected a store house at a cost of $12,000, thus diminishing their available assets, and kept their employees at a cost of $3,000 till their house was completed, and in the meantime their business was not paying expenses. They estimate their indebtedness at the time of the fire at $41,000 and their assets at $69,226.

They commenced buying goods immediately after the fire, and while they owed at that time about ninety different firms, at the time of the assignment they owed one hundred and forty different firms, and had increased their indebtedness $69,692, in the aggregate to the sum of $100,692.

On the 18th of August, 1879, Leopold Berger published in a paper at Malvern, Arkansas, the following notice, towit:

## "Firm Changed."

"I have this day sold out the Red Store in Malvern, Arkansas, to my sons, Ben and Henry Berger. Thanking the people for past favors, I hope the same patronage may be bestowed on my successors. I will continue to buy for B. & H. Berger, and keep them supplied with the best and cheapest goods produced in this country. St. Louis, August 18, 1879.            L. BERGER."

It appears that nothing was paid to B. &. H. Berger, but that L. Berger gave them his accumulated profits of the business, leaving in it, to be used as a part of the capital of the firm, his original capital of four thousand dollars, and that he was to receive a per cent. of the profits of the business, and was to do the buying for the firm.

After 1888, there does not seem to have been any material change in the business, except that, his health having failed, L. Berger ceased to be active in the business. As before, he seems to have left it to his sons to give him what the business would justify as his share of the profits.

In reference to selling out the business to his sons, L. Berger, when asked on cross-examination, "What was the price agreed upon for said business so sold by you to them?" answered: "There was no price agreed on at all, as I did not sell the business to them, as I have just stated."

Henry Berger admitted that he had testified in the federal court that L. Berger was a silent partner of B. & H. Berger; that he did not know how he would be considered; that up to 1887 part of the profits were allowed him; that after 1887 or 1888 he could not participate any further in the buying, and took no active part in it, and that he withdrew and left his money for the interest; that "he withdrew from the business actively."

After the assigment was made, and T. T. Johnson was appointed receiver, the appellees attached the property of the firm, and, the goods, etc., having been sold by order of the court, intervened and attacked the assignment for fraud, and now insist, among other grounds, that L. Berger was a partner of B. & H. Berger at the time of the assignment, and that he was preferred in the assignment for the amount of his capital in the business. The court held the assignment void for fraud, and the appellants brought the case to this court.

*Morris M. Cohn, S. R. Cockrill, Rose, Hemingway & Rose, Dodge & Johnson* and *N. P. Richmond* for appellants.

To the objection that Leopold Berger was a partner at the time of the assignment, there are two answers: (1) The evidence establishes that he was not a partner, and *never* was. (2) No such issue was presented in the court below. The mere participation in profits does not render one a partner. 44 Ark. 425.

*Jos. Loeb, G. W. Murphy, W. E. Atkinson, J. H. Harrod, Hamby & White, J. Erb, J. H. McCollum, Hugh McCollum, E. H. Vance, Jr., C. V. Teague,* and *Wood & Henderson* for appellees.

The facts in this case bring L. Berger within the rule laid down by the modern doctrine as to what will constitute a partnership, and establish that he was a partner of the firm, and his preference avoided the assignment. 57 Am. Rep. 552; 71 Ill. 148; 28 Ohio, 319; 22 Am. Rep. 94, 387; 17 Am. & Eng. Enc. Law, 850, 877, 881, and notes; 16 So. Rep. 392.

Test of partnership.

HUGHES, J., (after stating the facts.) Up to the year 1860, the rule in England and America was that participation in the profits of a business was a conclusive test of a partnership. But this rule was overthrown by the case of *Cox* v. *Hickman* in the House of

Lords in England (8 H. L. C. 260), and the final test was declared to be "whether the business has been carried on in behalf of the person sought to be charged as a partner, *i. e.*, did he stand in the relation of the principal toward the ostensible traders by whom the liabilities have been incurred, and under whose management the profits have been made?"

This is the settled rule in England, and has been very generally adopted in this country. *Culley* v. *Edwards*, 44 Ark. 427. In the case of *Pooley* v. *Driver*, 5 Ch. Div. 458, decided in England after *Cox* v. *Hickman*, and in other cases, it is held "participation in profits, or the right to participate in profits, is cogent evidence, and, standing alone, may be conclusive evidence of a partnership, but in case of a party who has not acted as a principal in the business, and therefore is not ostensibly a partner, may be explained and overcome by other circumstances." *Wild* v. *Davenport*, (N. J. L.) 57 Am. Rep. 556.

In the case of *Cox* v. *Hickman*, Lord Cranworth put it in this way (8 H. L. C. 306): "It is often said that the test, or one of the tests, whether a person not ostensibly a partner is nevertheless in contemplation of law a partner is whether he is entitled to participate in the profits. This no doubt is in general a sufficiently accurate test; for a right to participate in profits affords cogent, often conclusive, evidence that the trade in which the profits have been made was carried on in part for or on behalf of the person setting up such claim. But the real ground of the liability is that the trade has been carried on by persons acting in his behalf. * * * * It is not strictly correct to say that his right to share in the profits makes him liable to the debts of the trade. The correct mode of stating the proposition is to say that which entitles him to the one makes him liable to the

other, namely, the fact that the trade has been carried on in his behalf, *i. e.*, that he stood in the relation of principal towards 'the persons acting ostensibly as the traders, by whom the liabilities have been incurred, and under whose management the profits have been made."

Partici-
pation in
profits.
In commenting upon this statement of Lord Cranworth, it is said in *Pooley* v. *Driver:* "Now what Lord Cranworth means there is quite plain. He says in fact that the participation in the profits is sufficent proof of partnership if there is nothing to get rid of it. If you find an association, and a contract made by the members of the association that the trade is to be carried on, and that they are to share the profits in certain proportions, then that makes a partnership, unless you can show from the surrounding circumstances some other relation. It is not impossible to show some other relation, but, as he says, it is very difficult to do so. It is often conclusive by itself—not always." And further, it is said: "Now a dormant partner means a person who does not take an active part in the conduct of the business, and who may be, and often is, prohibited from taking such active part. Therefore, when the inquiry is whether a man is a dormant partner, it does not appear to me to aid that inquiry by saying that there are provisions preventing his taking an active part in the conduct of the business, or that there are provisions which make it optional for him to take an active part in the business or not. It only shows he is not an active partner."

It is contended that the money that Leopold Berger had in the business of B. & H. Berger was only a loan. It is said that the profits paid him were for interest on the money loaned the firm. Sharing profits does not constitute a lender a partner, "though it is a cogent test for trying the question," and is conclusive unless there

are some circumstances altering the nature of the contract. *Pooley* v. *Driver*, 5 Ch. Div. 486.

In *Dubos* v. *Jones*, the supreme court of Florida says: "To constitute a loan in such a case the money advanced must be returnable in any event. It is not a loan, if repayment is contingent upon the profits, for in such case it is made, not upon the personal responsibility of the borrower, but upon the security of the business. Neither must the transaction be a mere device to obtain the benefits of a partnership, without incurring its responsibilities, for in such case, whatever else the parties may call it, it will be construed to be a partnership." *Dubos* v. *Jones*, 16 So. Rep. 392; *Harvey* v. *Childs*, 28 Ohio St. 319; S. C. 22 Am. Rep. 387; *Pooley* v. *Driver*, 5 Ch. Div. 358.

So it seems it is not so much what is said as what is done that constitutes a partnership.

Mr. Lindley in Vol. 1, star page 12, says: "Where no statute interferes, an agreement to share profits is *prima facie* an agreement for a partnership, and accordingly it has been held that, unless an intention to the contrary can be shown, persons engaged in any business or adventure and sharing the profits derived from it are partners as regards that business or adventure." Citing *Pooley* v. *Driver*, *supra*. This is not in any sense in conflict with *Cox* v. *Hickman*, *supra*; 1 Lindley on Partnership, *page 26, note c. Parsons on Partnership, sec. 46, says: "The result of the English cases seems to be the abandonment of any artificial test of partnership, and the adoption of what must be regarded as the true principle, that parties become partners only by agreeing to enter into an association which the law regards as a partnership. The agreement, either express or implied, to form such an association is the only method by which one can become a true partner. Whether such an association is intended to be formed is

a question of fact in each case." In sec. 54 Mr. Parson says: "The true test of partnership, then, is the intention of the parties. * * * * * The intention to form a partnership may be expressed in the contract, or it may be gathered from all the acts and from all the circumstances which are available for the interpretation or construction of the contract." See also 1 Lindley on Partnership, *page 10. He says: "But an agreement to share profits and losses may be said to be the type of a partnership contract," etc.

Never until September 20, 1892, after the firm was evidently, if not insolvent, 'in a precarious condition financially, did Leopold Berger, as far as the evidence shows, demand or receive any note or promise for the repayment of the money he claims to have loaned B. & H. Berger, and he was an experienced business man. If he was a partner, it was a convenient thing to do, when the firm was in a condition that it soon became necessary for it to make an assignment, to take a note for the amount of capital he had in the firm as for so much loaned money for which he might be preferred when the assignment was made, and thus save the amount of his capital, and avoid making his valuable property in St. Louis liable for the debts of the firm. The note was taken in September, 1892; the assignment was 2d January, 1893.

The facts in the case afford cogent evidence, and, taken altogether, we think, a clear preponderance of evidence that L. Berger was a partner with B. & H. Berger, in their business at Malvern, from 1879 to the time of the assignment in 1893, and that the preponderance of the evidence sustains the decree of the chancellor, that the assignment was fraudulent and void, and the decree must be affirmed. It is so ordered.

BUNN, C. J., and BATTLE, J., dissent.